Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

 

Agreement Reference Number: [ ]

## COLLABORATION AGREEMENT

**THIS COLLABORATION AGREEMENT** (the "**Agreement**") is made on 11th November, 2024 (the "**Effective Date**")

**BETWEEN:**

    (1) **BITMAIN TECHNOLOGIES GEORGIA LIMITED,** a corporation incorporated under the laws of the State of Georgia (File No. 21203283), having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076 **("BITMAIN"); and**

    (2) **OLD CONST LLC.** a [limited liability company formed] under the laws of the State of Delaware (File No. 2938590), having its registered office at 254 Chapman Rd, Ste 209, Newark DE 19702 ("**Purchaser**").

BITMAIN and the Purchaser shall be hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS:**

(A)    Purchaser is the lessee and operator of the Data Center Facility (as defined below).

(B)    The Parties have entered into the Collaboration Sale Agreement dated as of the date hereof (the "**Collaboration Sale Agreement**"), wherein Purchaser agreed to purchase the Products (as defined in the Collaboration Sale Agreement) from BITMAIN for the Net Total Price, in accordance with the terms and conditions therein.

(C)    The Parties have entered into the Hosting Services Agreement dated as of the date hereof (the "**Hosting Services Agreement**"), wherein Purchaser agrees to provide certain hosting services to BITMAIN, and which includes a mechanism to pay the Discounted Amount for Products due under the Collaboration Sale Agreement by providing Wholesale Hosting Unit Price (as defined in Section 1.1 of the Hosting Services Agreement) pursuant to the Hosting Services Agreement.

(D)    The Parties have entered into the On-Rack Sales and Purchase Agreement dated as of the date hereof (the "**On-Rack SPA**"), wherein Purchaser agrees to purchase the HASH Super Computing Server hosting in the Data Center Facility, as set forth in the Hosting Services Agreement.

(E)    The Parties wish to compliment the terms of the Collaboration Sale Agreement and the Hosting Services Agreement with the terms and conditions herein.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants set forth in this Agreement, the Parties agree as follows:

1

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

1.    **DEFINITIONS AND INTERPRETATIONS**

1.1.    <u>Definitions</u>. Unless otherwise defined herein, the following terms shall have the meanings ascribed to them below:

"**Affiliates**" or "**Affiliate**" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"**Applicable Laws**" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other province, state or part thereof or international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"**Billing Period**" has the meaning set out in the Hosting Services Agreement.

"**BITMAIN Associates**" has the meaning set out in Section 11.1.

"**BITMAIN Indemnitees**" has the meaning set out in Section 7.1.

"**BITMAIN Website**" means the official website of BITMAIN available at the following URL link: https://shop.bitmain.com.

"**Business Days**" means a day (other than Saturday or Sunday) on which banking institutions in China and the Relevant Jurisdiction are open generally for normal banking business.

"**Claims**" or "**Claim**" has the meaning set out in Section 7.2.

"**Collateral**" has the meaning set out in Section 9.1.

"**Confidential Information**" has the meaning set out in Section 6.1.

"**Control**" means, with respect to any Person, the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that, in the case of a Person that is an entity, such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the holders of the shares or other equity interests or registered capital of such Person or power to control the composition of a majority of the board of directors or similar governing body of such Person. The terms "**Controlled**" and "**Controlling**" have meanings correlative to the foregoing.

2

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

"**Data Center Facility**" means the hydro-cooling data center facility [leased] and operated by Purchaser where the Products and Hosted Servers will be physically located during the Discount Repayment Period.

"**Delivery Date**" means the date on which the Products are delivered to the export carrier by BITMAIN for shipping to the Purchaser in accordance with the Collaboration Sale Agreement.

"**Disclosing Party**" has the meaning set out in Section 6.1.

"**Discounted Amount**" has the meaning set out in the Collaboration Sale Agreement.

"**Discount Repayment Period**" has the meaning set out in Section 3.1.

"**End Date**" has the meaning set out in Section 3.2.

"**Event of Default**" has the meaning set out in Section 9.8.

"**Governmental Authority**" means any government of any nation, or government of any province, territory, state or locality or any other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of any country, or any political subdivision thereof, any court, tribunal or arbitrator, and any self-regulatory organization.

"**Hosted Servers**" has the meaning set out in the Hosting Services Agreement.

"**Hosting Services Agreement**" has the meaning set out in the recitals to this Agreement.

"**Intellectual Property Rights**" means any and all right, title and interest in and to all worldwide patent rights (including patent applications and disclosures), copyright rights, mask work rights, trade secret rights, know-how and any and all other intellectual property or proprietary rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any derivative rights therefrom.

"**Knowledge**" means with respect to Purchaser, the actual knowledge of the management team of the Purchaser including knowledge which should have been acquired after making such due inquiry and exercising such due diligence as a prudent business person who would have made or exercised in the management of its business affairs, including but not limited to due inquiry of all necessary officers, directors and

3

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

professional advisers of Purchaser and its Affiliates who could reasonably be expected to have knowledge of the matters in question.

"**Net Total Price**" has the meaning set out in the Collaboration Sale Agreement.

"**Settlement Hosting Unit Price**" has the meaning set out in the Hosting Services Agreement.

"**Outstanding Discount**" means the difference between the Discounted Amount and the Total Hosting Fee Discount as at the date of its calculation.

"**Partner Entities**" means any Person in which BITMAIN or any Affiliates of BITMAIN or any significant shareholders of BITMAIN hold a significant ownership interest within. For purposes of the definition of Partner Entities, "significant" shall mean shareholdings or ownership interests, directly or indirectly, in the aggregate in such Person exceeding 25% based on the issued and outstanding shares or ownership interests in such Person, provided that BitFuFu Inc. and its Affiliates shall be deemed to be a Partner Entity of BITMAIN.

"**Person**" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality).

"**Power Consumption**" has the meaning set out in the Hosting Services Agreement.

"**Products**" has the meaning set out in the Collaboration Sale Agreement.

"**Prudent Industry Practices**" means those practices, methods, acts, equipment, specifications and standards of safety and performance, as the same may change from time to time, which a prudent owner or operator in the United States or Canada of a data center facility, crypto mining equipment or other ancillary hardware equipment of a type and size similar to the Data Center Facility would use or follow to accomplish the desired objectives and results lawfully, reliably and safely. Notwithstanding the foregoing, Prudent Industry Practices are not intended to be limited to the optimum practices, methods, acts, equipment, specifications or standards of safety and performance to the exclusion of all others but rather to be acceptable practices, methods, acts, equipment, specifications and standards of safety and performance generally accepted in the industry or requirements to comply with Applicable Laws.

"**Purchase**" has the meaning set out in Section 2.1(b).

"**Purchaser Associates**" has the meaning set out in Section 11.1.

"**Receiving Party**" has the meaning set out in Section 6.1.

4

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

"**Reconciliation Statement**" has the meaning set out in the Hosting Services Agreement.

"**Relevant Jurisdiction**" means the state of Texas, United States of America.

"**Total Hosting Fee Discount**" means the total amount of discounts received by BITMAIN under the Hosting Services Agreement and shall equal the following as at the date of its calculation, $\sum$*Power Consumption x (Settlement Hosting Unit Price – Wholesale Hosting Unit Price)*.

"**Total Purchase Price**" has the meaning set out in the Collaboration Sale Agreement.

"**Unrestricted Account Balance**" means any available money or fund that has been registered as the credit balance in the Purchaser's user account registered on the BITMAIN Website but excluding any amount being processed for any specific purchase or order, as set out in the Collaboration Sale Agreement.

"**Wholesale Hosting Unit Price**" has the meaning set out in the Hosting Services Agreement.

1.2.    Interpretation. In this Agreement, unless otherwise specified:

(a)    the words "include," "includes," and "including" are deemed to be followed by the words "without limitation", and the word "or" is not exclusive;

(b)    the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole;

(c)    any singular term in this Agreement shall be deemed to include the plural and vice versa where the context so requires;

(d)    the headings in this Agreement are inserted for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement;

(e)    the exhibits, schedules, attachments, and appendices referred to herein are an integral part of this Agreement to the same extent as if they were set forth verbatim herein;

(f)    references to sections, exhibits, schedules, attachments, and appendices mean the sections of, and exhibits, schedules, attachments, and appendices to, this Agreement, unless expressly stated otherwise;

(g)    references to days, dates and times are to the days, dates and times of the Relevant Jurisdiction, unless otherwise indicated;

(h)    unless specifically stated otherwise, all references to days shall mean calendar days;

5

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

(i)     references to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof;

(j)     references to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment, amendment, successor legislation thereto and any regulations promulgated thereunder, for the time being in force; and

(k)     "**$**", "**US$**", "**US dollar**", "**US dollars**", "**dollar**" and "**dollars**" denote lawful currency of the United States of America.

1.3. The Parties intend this Agreement to be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

1.4. Any capitalized terms used herein that are not otherwise defined herein shall have the meaning ascribed to such term in the Hosting Services Agreement or Collaboration Sale Agreement.

1.5. Purpose and Order of Priority. This Agreement is to be read and interpreted in conjunction with the Hosting Services Agreement and Collaboration Sale Agreement. In the event of a conflict between the terms of (a) this Agreement and the Hosting Services Agreement; (b) this Agreement and the Collaboration Sale Agreement; or (c) this Agreement, the Hosting Services Agreement and the Collaboration Sale Agreement, the terms of this Agreement shall govern in all such circumstances.

## 2.    OBLIGATIONS OF THE PARTIES

2.1.    Purchaser Obligations.

(a)    Construction and Operation of the Data Center Facility. In connection with the purchase of the Products under the Collaboration Sale Agreement, the Purchaser shall: (i) provide the Data Center Facility site with electrical power and the water supply required under the Hosting Services Agreement; (ii) be responsible for infrastructure construction and fundamental equipment installation of and within the Data Center Facility for the operation of the Data Center Facility according to the design and specifications outlined in the applicable Appendix of the Hosting Services Agreement; and (iii) be responsible for site security, environment safety and stable daily operation of the Data Center Facility.

(b)    Sales and Purchase of Products. The Purchaser acknowledges that the Total Purchase Price for the Products under the Collaboration Sale Agreement consists of (i) the Net Total Price paid in accordance with the Collaboration Sale Agreement; (ii) the Unrestricted Account Balance applied, if any, and (iii) the

6

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

Discounted Amount paid in accordance with Schedule C of this Agreement and the Hosting Services Agreement (the "**Purchase**").

(c)  Notice of Damage or Infringement. Purchaser shall, during the Discount Repayment Period, promptly notify BITMAIN in writing, and take all such steps as may reasonably be required by BITMAIN, if Purchaser becomes aware of any actual or suspected damage, infringement, or any violation of BITMAIN's Intellectual Property Rights in and to the Products.

(d)  Insurance. Purchaser shall maintain in full force and effect during the Discount Repayment Period commercial general liability insurance for its business and property insurance covering each Data Center Facility and the Products therein at its own expense from financially sound and reputable insurers with a minimum rating of A—in the current Best's Rating Guide in amounts that are commercially reasonable in accordance with Prudent Industry Practices. Purchaser will: (i) name BITMAIN as an additional insured under such insurance policies; (ii) include waivers of subrogation in favour of BITMAIN; (iii) not make any significant changes to such insurance policies or coverages during the Term without prior written approval from BITMAIN; and (iv) will, upon request, provide certificates of insurance evidencing such coverages for review by BITMAIN.

2.2. Installation and Maintenance of Products.

(a)  Installation. Purchaser shall be responsible for, unless otherwise agreed to in writing between the Parties, the installation of the Products at the Data Center Facility with available call-in support from BITMAIN's helpdesk during BITMAIN's helpdesk's normal business hours.

(b)  Maintenance. During the Discount Repayment Period, unless otherwise agreed to in writing between the Parties, BITMAIN shall be responsible for the maintenance of the Products.

(c)  Training. Upon the conclusion of the Discount Repayment Period, BITMAIN shall provide necessary training to the Purchaser regarding the operation and maintenance of the Products without additional charge unless expressly agreed otherwise in writing.

**3.  DISCOUNT REPAYMENT PERIOD**

3.1.  The Purchaser shall repay the Discounted Amount in accordance with the repayment schedule set out in Schedule C (the "**Discount Repayment Period**"), starting from the Initial Date (as defined in the Hosting Services Agreement) and initially lasting 360 days. The Discount Repayment Period will automatically extend on a day-by-day basis, as set out in Section 3.2 hereof or shortened pursuant to Section 3.3hereof.

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

3.2. The Discount Repayment Period shall not conclude until the date when the (a) Total Hosting Fee Discount equals the Discounted Amount; or (b) Purchaser makes payment of the Outstanding Discount to BITMAIN, and all obligations of Purchaser to BITMAIN arising under this Agreement are fully performed and discharged (the "**End Date**"). The Total Hosting Fee Discount and Outstanding Discount shall be calculated and confirmed by the Parties together with the Reconciliation Statement for each Billing Period under the Hosting Services Agreement.

3.3. Subject to written confirmation by BITMAIN, the Discount Repayment Period may be shortened in the following events, where the Purchaser or its Affiliates:

    (a) reduces the Wholesale Hosting Unit Price, as defined in Appendix 1 of the Hosting Services Agreement;

    (b) reduces, waives, or offers an additional discount of the Hosting Fee, as defined in Section 1.1 of the Hosting Services Agreement; and/or

    (c) purchases the Products, by making payment of the Outstanding Discount for the Products.

## 4. TERM AND TERMINATION

4.1. This Agreement shall have a term commencing on the Effective Date and expiring on the earlier of (a) the conclusion of the Discount Repayment Period; (b) the termination of the Collaboration Sale Agreement in accordance with Section 6.1 thereof; or (c) the termination of the Hosted Services Agreement (the "**Term**").

4.2. This Agreement may be terminated prior to the expiry of the Term (a) upon mutual agreement in writing of the Parties; or (b) at BITMAIN's sole discretion, upon an Event of Default by Purchaser.

4.3. Upon termination of this Agreement prior to the conclusion of the Discount Repayment Period, Purchaser shall be obligated to pay the Outstanding Discount to BITMAIN for the Products. For clarity the Total Hosting Fee Discount provided to BITMAIN by Purchaser under the Hosting Services Agreement and all other payments made to BITMAIN by Purchaser under this Agreement, the Collaboration Sale Agreement and the Hosting Services Agreement are non-refundable, unless otherwise explicitly stated herein or therein.

4.4. The expiration or termination of this Agreement will not release either of the Parties from any obligation or liability that accrued prior to such expiration or termination.

4.5. The provisions of this Agreement requiring performance or fulfillment after the expiration or termination of this Agreement will survive the expiration or termination of this Agreement including this Section 4.5, Section6, Section 7, Section 8, Section 9, Section 12 and such other provisions as are necessary for the interpretation therefor

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

and any other provisions that by their nature and intent survive termination or expiration of this Agreement.

5.    **REPRESENTATIONS AND WARRANTIES AND COVENANTS**

5.1.    Each Party hereby makes the following representations and warranties to the other Party for the Term of this Agreement:

    (a)    it is duly incorporated or organized, validly existing and in good standing (or equivalent status) under the laws of the jurisdiction of its incorporation or organization, and it has the full power and authority to own its assets and carry on its businesses;

    (b)    it has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement; and

    (c)    the entry into, and performance by it of the transactions contemplated by this Agreement do not and will not conflict with: (i) any Applicable Laws; (ii) its governing documents; or (iii) any agreement or instrument to which it is a party.

5.2.    Purchaser hereby represents that it has provided Bitmain with all the information and materials of which it has Knowledge in accordance with BITMAIN's due diligence requirements for the Data Center Facility set out in the Hosting Services Agreement. No information or materials provided by Purchaser contain any untrue statement or omit any material fact.

5.3.    Purchaser has good and marketable title to, or right by license, lease or other agreement to use the Data Center Facility to operate the Products and there is no actual, pending or threatened dispute or other claim as to title, ownership or Purchaser's use of the Data Center Facility as contemplated herein, the Collaboration Sale Agreement or the Hosting Services Agreement.

5.4.    To the Knowledge of the Purchaser, the Purchaser's current use and intended use under the Collaboration Sale Agreement and this Agreement of the Data Center Facility complies in all material respects with all Applicable Laws, including zoning requirements, and the Purchaser has not received any notification from any Governmental Authority or the Landlord of the Data Center Facility in respect of any expropriation orders or any failure to use the Data Center Facility in compliance with Applicable Laws or a DCF Agreement. The Purchaser is not and, to the Knowledge of the Purchaser, no other party to any agreement for the lease, rent or use of the Data Center Facility (such agreement, a "**DCF Agreement**") is, in material breach of or material default under, any DCF Agreement. To the Knowledge of the Purchaser, no event has occurred that (with or without notice, lapse of time or both) would constitute a material default by the Purchaser under any DCF Agreement. The

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

Purchaser has not received any notice to terminate, in whole or in part or materially amend any DCF Agreement.

5.5. Purchaser shall store and operate the Products at the Data Center Facility separate from Purchaser's other assets at the Data Center Facility.

## 6.    CONFIDENTIALITY

6.1.    Each Party (the "**Disclosing Party**") may disclose to the other Party (the "**Receiving Party**") certain of its confidential or proprietary information, including information which is capable of identifying individuals ("**Confidential Information**"). Receiving Party agrees to exercise at least the same degree of care to safeguard Confidential Information of Disclosing Party as Receiving Party exercises to safeguard the confidentiality of its own confidential information, but not less than reasonable care. The Receiving Party agrees that it shall not, except to the extent required by Applicable Laws or any Governmental Authority having jurisdiction, disclose, communicate, provide, or otherwise make available the Confidential Information to any entity, Person, firm or corporation.

6.2.    <u>Exclusions</u>. The obligations of the Receiving Party set out in Section 6.1 shall not extend to information that, the Receiving Party can establish by written evidence: (a) is or that becomes publicly known through no wrongful act of the Receiving Party; (b) is properly made available to the Receiving Party without confidential or proprietary restriction from a source other than the Disclosing Party or the Disclosing Party's Affiliates; (c) that the Receiving Party can show was rightfully in its possession without obligation of confidentiality; or (d) that is independently developed without reference to the Disclosing Party's Confidential Information. For clarity, these exclusions do not extend to Confidential Information which is capable of identifying individuals.

6.3.    <u>Permitted Disclosure.</u> Notwithstanding the foregoing, each Party may disclose the Confidential Information (a) to its Affiliates, employees, directors, officers, professional advisors, agent and other Persons acting on their behalf who need to know so long as such Persons are subject to nondisclosure obligations at least as burdensome as those contained herein; (b) as required by Applicable Laws or requests or requirements from any Governmental Authority or other applicable judicial or legal process, provided that prior to any such disclosure, the Receiving Party shall promptly notify the Disclosing Party in writing and reasonably cooperate with the Disclosing Party to avoid or limit such disclosure to the extent legally permitted, and to obtain a protective order or other available protections to the extent such disclosure is required; (c) with the prior written consent of the other Party; or (d) solely with respect to BITMAIN, its Partner Entities so long as such Persons are subject to the nondisclosure obligations at least as burdensome as those contained herein.

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

6.4.    <u>Injunctive Relief.</u> Purchaser acknowledge that monetary damages may not provide a remedy in the event of breach of Sections 6 and 9.10 of this Agreement and therefore, in addition to any other rights or remedies available to BITMAIN at law or equity, Purchaser agrees that BITMAIN may seek injunctive relief, without the necessity of obtaining any form of bond or undertaking whatsoever and without the necessity of proving actual damages, and waives any claim or defense that damages may be adequate or otherwise preclude injunctive relief.

6.5.    <u>Effect of Termination</u>. Within five (5) Business Days from the date of termination or expiration of this Agreement, Purchaser shall return all of BITMAIN's Confidential Information to BITMAIN and delete any and all electronic or other copies from the Purchaser's systems.

## 7.    INDEMNIFICATION

7.1.    Purchaser shall indemnify, defend and hold harmless BITMAIN, its Affiliates and their respective officers, directors, agents, consultants, employees, advisors and other representatives (collectively, "**BITMAIN Indemnitees**") from and against from and against all liabilities and losses (including, without limitation, any third party action, claim, suit, proceeding, demand, investigation, or charge alleging any costs, losses, liabilities, damages, fines, judgments, fees, or expenses, and reasonable legal fees and court costs) directly or indirectly, as a result of, based upon, arising out of or in connection with:

(a) Purchaser's performance or failure to perform any covenant, agreement, obligation or undertaking in this Agreement (including agreements referenced herein and all exhibits, schedules and appendices hereto);

(b) any liability or damage to the Products incurred by reason of any act or omission of the Purchaser, including but not limited to, frequent power outages at the Data Center Facility or the Data Center Facility being shut down;

(c) any failure to comply with Applicable Laws in connection with this Agreement;

(d) any and all claims from, by, with respect to, or in any way related to the Data Center Facility, including but not limited to conditions concerning health, safety, sanitation, or accessibility; and

(e) any inaccuracy in, or any breach of, any representation or warranty of Purchaser in this Agreement (including all exhibits, schedules and appendices hereto) or any certification or report made by or on behalf of Purchaser pursuant to or in connection with this Agreement; and

(f) any and all actions, suits, proceedings, arbitrations, demands, assessments, judgments, damages, awards, costs and expenses (including third party fees and expenses) incident to any of the foregoing or incurred in connection with the

11

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

enforcement of the rights of any BITMAIN Indemnitee with respect to the foregoing.

7.2.  Notwithstanding anything to the contrary herein, the indemnification liability of Purchaser with respect to BITMAIN Indemnitees under this Agreement shall include but not be limited to any and all demands, claims, suits, actions, causes of action, proceedings, arbitrations, assessments, deficiencies, diminution in value, costs, losses, indemnities, liabilities, damages, fines, penalties, judgments, fees, or expenses (including attorney's fees, court costs, transportation fees, increased insurance premium) directly or indirectly, whether arising from a third party claim or otherwise, incurred by any BITMAIN Indemnitee ("**Claims**").

7.3.  In addition to BITMAIN's other rights and remedies at law or equity, if Purchaser breaches any representation or warranty herein or any certification or report made by or on behalf of Purchaser, or fails to perform any covenant, agreement, obligation or undertaking in this Agreement (including all exhibits, schedules, and appendices hereto), BITMAIN shall be entitled to:

(a) withhold the whole or part of any payments due to Purchaser under the Hosting Services Agreement; and

(b) seek equitable remedies, including injunctive relief, with respect to Purchaser's obligations under this Agreement, or for restitution by Purchaser of amounts improperly received under this Agreement.

7.4.  Without limiting Purchaser's indemnification obligations set forth herein, regardless of whether a breach has occurred, BITMAIN may deduct and set-off against any sum due to Purchaser, including setting off or deducting such sums against the interest outstanding prior to the outstanding Total Purchase Price, under the Hosting Services Agreement with any amounts due from Purchaser to BITMAIN under or in connection with this Agreement or the Collaboration Sale Agreement.

7.5.  In the event that: (a) BITMAIN asserts a Claim against Purchaser, and Purchaser fails to respond to the Claim and take remedial action satisfactory to BITMAIN within ten (10) days following receipt of written notice from BITMAIN; or (b) any third party asserts a Claim against Purchaser or BITMAIN which is subject to the Purchaser's indemnification obligations, and Purchaser fails to use counsel reasonably acceptable to BITMAIN within ten (10) days following receipt of written notice from BITMAIN, BITMAIN shall, without limiting any of its other rights, be entitled to do either or both of the following: (i) terminate this Agreement by written notice with immediate effect; and (ii) control the defense and settlement of any such claim using counsel of its own choice, with Purchaser bearing the costs and expenses of such representation, and Purchaser may not settle any Claim subject to the indemnification provisions herein without BITMAIN's prior written consent. For avoidance of doubt, BITMAIN shall be entitled to participate in any defense using its own counsel at its own cost.

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

8. **LIMITATION OF LIABILITY**

8.1.   BITMAIN shall not be liable to the Purchaser for special, indirect, consequential, exemplary or punitive damages, loss of business, loss of profits or loss of revenue, arising out of or related to this Agreement, regardless of the cause of action, whether in contract, negligence, tort or otherwise, even if BITMAIN has been advised of the possibility of such damages.

8.2.   BITMAIN shall not be liable to the Purchaser for damages and all losses, liabilities, damages, costs (including taxes), and all related expenses, including reasonable legal fees and disbursements and costs of investigation, litigation and settlement, together with interest and penalties, arising under this Agreement, regardless of the theory of liability, and whether or not arising in contract, tort or otherwise, exceeding, in the aggregate, the Total Hosting Fee Discount calculated as at the time of a Claim for such damages and losses.

8.3.   BITMAIN shall not have any liability or obligation to return any payments and accrued Total Hosting Fee Discount upon the termination of this Agreement including, without limitation, termination by BITMAIN in accordance with this Agreement or the Hosting Services Agreement. The Total Hosting Fee Discount is non-refundable.

9. **OWNERSHIP AND SECURITY INTEREST**

9.1.   To secure payment and performance of all of Purchaser's obligations and liabilities hereunder to BITMAIN, Purchaser hereby grants BITMAIN a purchase-money security interest in the Products, wherever located, and whether now existing or hereafter arising or acquired from time to time, and in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing (collectively, the "**Collateral**"). The attachment of the security interest has not been postponed and shall attach to the Collateral as soon as Purchaser directly or indirectly obtains possession of the Collateral.

9.2.   BITMAIN, in its sole discretion, may register, file or record the security interest contemplated herein in all jurisdictions where such registration, filing, or recording is necessary or of advantage to BITMAIN for the creation, perfection, preservation or protection of such security interest, including a notice of security interest on title to the Data Center Facility.

9.3.   Purchaser shall promptly execute and deliver to BITMAIN, at Purchaser's expense, such further documents, and shall take such further actions, as BITMAIN may request in order to fully create, perfect and maintain BITMAIN's security interest in the Collateral.

9.4.   Purchaser covenants with BITMAIN as follows: (a) Purchaser shall, at its own cost and expense, protect and defend title to the Collateral and will notify BITMAIN of any damage to, or claim of any person on, the Collateral; (b) the Collateral shall not

13

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

    be removed from the Data Center Facility without the prior written consent of BITMAIN; and (c) Purchaser, or any Person on behalf of the Purchaser, shall not make any change, fix, amendment, update, or alteration to the Collateral prior to the End Date.

9.5.    The security interest contemplated in this Section shall be released and discharged following the End Date and BITMAIN shall provide the Purchaser, if requested by Purchaser in writing, at Purchaser's expense, with release documents and the financing statements evidencing such discharge. On the Delivery Date, all rights, title and interest in and to the Collateral shall belong to Purchaser, other than BITMAIN's security interest contemplated in this Section 9, notwithstanding whether any Products, is or becomes placed or resting upon, or attached or affixed to, the Data Center Facility.

9.6.    Purchaser irrevocably constitutes and appoints BITMAIN and any of its officers or agents, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Purchaser or in BITMAIN's own name, for the purpose of doing the following: on the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to, or otherwise dispose of or deal with any of the Collateral in such manner permitted under Applicable Law and as fully and completely as though BITMAIN were the absolute owner thereof for all purposes; and to do, at Purchaser's expense, at any time, or from time to time, all acts and things which BITMAIN deems necessary or useful to protect, preserve, or realize upon the Collateral and security interest. This power of attorney is coupled with an interest and is irrevocable and may only be exercised upon an Event of Default that is continuing.

9.7.    This Section 9 is a security agreement. Purchaser acknowledges receipt of a copy of this Agreement and a copy of the financing statements made in connection herewith.

9.8.    The following events shall each constitute an event of default hereunder (each an "**Event of Default**"): (a) Purchaser fails to pay any amount provided for herein within thirty (30) days after the same is due and payable, including amounts due under the Collaboration Sale Agreement and the Hosting Services Agreement; or (b) Purchaser breaches any of the other material provisions of this Agreement, the Collaboration Sale Agreement and the Hosting Services Agreement and has not cured such breach within thirty (30) days of its occurrence or such other period as otherwise provided herein and therein; or (c) the dissolution, liquidation, or insolvency of Purchaser occurs including, without limitation, any bankruptcy, reorganization, debt arrangement, or other proceeding that is instituted by or against Purchaser. Upon the occurrence of an Event of Default, BITMAIN may declare all of Purchaser's obligations under this Agreement immediately due and payable, without presentment, demand, protest or further notice, all of which are hereby expressly waived by the Purchaser. Upon the occurrence of an Event of Default that is continuing, the BITMAIN may proceed to realize upon the Collateral and immediately enforce its

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

rights and remedies (which rights and remedies may be exercised independently or in combination), including all rights and remedies of a secured party under the Applicable Law and all rights under the notice of security interest registered on title to the Data Centre Facility, and for that purpose BITMAIN may, so far as Purchaser can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom.

9.9.    Upon the occurrence of an Event of Default, Purchaser shall arrange for BITMAIN and its representatives to have free and unfettered access to the Data Center Facility (including via any service roads, easements, private roads, or other rights of way), at Purchaser's expense for BITMAIN to remove the Collateral.

9.10.   Upon the occurrence of the Event of Default, to the extent permitted by Applicable Law, the Purchaser hereby waives and renounces any right under Applicable Laws or equity that Purchaser may have to object to any action, claim, suit, proceeding or demand initiated by BITMAIN, or the appointment of any receiver, manager, interim receiver, or receiver and manager by BITMAIN, for the removal of the Collateral from the Data Center Facility, and confirms and agrees that it will diligently and expeditiously cooperate with BITMAIN for any such removal.

9.11.   Purchaser will not, until the End Date, encumber, lease or otherwise dispose, sell, transfer, salvage or convey any part of the Collateral. Purchaser will not file, or by its action or inaction permit, any warehousemen or other liens to be filed on or against any of the Collateral. Purchaser confirms and agrees that the Collateral consisting of trade fixtures such as equipment bolted to the floor shall not be deemed a fixture or part of the real estate.

9.12.   BITMAIN shall be permitted to affix to any or all Collateral a marker identifying BITMAIN as the holder of a security interest in the Collateral and Purchaser hereby agrees to not remove or alter any such identifying marker until the End Date.

**10.    NOTICES**

10.1.   All notices, requirements, requests, claims, and other communications in relation to this Agreement shall be in writing, and shall be given or made by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested) or electronic mail to the respective Parties at the addresses specified below or at such other address for a Party as may be specified in a notice given in accordance with this Section. Any such notice or other communication shall be deemed to have been given and received on the day on which it was delivered or transmitted (or, if such day is not a Business Day, on the next following Business Day).

10.2.   Address of each Party for notices:

    **If to Purchaser:**

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

| | |
|---|---|
| Address: | [254 Chapman Rd, Ste 209, Newark DE 19702] |
| Attn: | [Support Departement] |
| Email: | [info@hashvalley.us] |

**If to BITMAIN:**

| | |
|---|---|
| Address: | 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA |
| Attn: | Legal Department |
| Email: | legal@bitmain.com |

## 11.    ANTI-COMMERCIAL BRIBERY

11.1.    Purchaser shall not, and shall procure its directors, officers, employees, consultants, agents and other representatives (collectively with Purchaser, the "**Purchaser Associates**") not to, directly or indirectly engage in any activity of commercial bribery, i.e. providing any unjustified interests in any form including but not limited to cash, cheque, credit card gifts, negotiable securities (including bonds and stocks), physical objects (including all kinds of high-end household goods, luxury consumer goods, handicrafts and collections, as well as housing, vehicles and other commodities), entertainment coupon, membership card, currency or rebate in the form of goods, kickback, non-property interests such as schooling, honor, special treatment, and employment for relatives and friends, traveling, entertaining and personal service etc. to any director, officer, employee, consultant, agent and other representative of BITMAIN (collectively, "**BITMAIN Associates**") in order to obtain the any immediate or future business opportunity with BITMAIN whether under this Agreement or any other business relationship, regardless of whether such unjustified interests is provided on Purchaser Associates' own initiative or in response to explicit or implicit request of BITMAIN Associates.

11.2.    If any of BITMAIN Associates explicitly or implicitly requests commercial bribes, Purchaser shall immediately notify BITMAIN of such activity with relevant evidence and cooperate with BITMAIN in its investigation.

11.3.    If any of Purchaser Associates commits commercial bribes in contravention of this Section, BITMAIN shall be entitled to terminate this Agreement and any other existing business cooperation with Purchaser and claim for all damages against Purchaser.

## 12.    GENERAL

12.1.    Entire Agreement and Amendment. This Agreement and the other agreements referenced herein, together with all appendices, schedules, annexes and exhibits, constitute the full and entire understating and agreement between the Parties, and

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

supersede all other agreements between or among any of the Parties with respect to the subject matters hereof and thereof. This Agreement may only be amended with the written consent of both Parties.

12.2. <u>Waiver</u>. Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

12.3. <u>Assignment</u>.

(a) BITMAIN may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party.

(b) Purchaser may assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part, provided the Purchaser obtains BITMAIN's prior written consent and such assignment also assign's the Purchaser's rights under the Collaboration Sale Agreement and the Hosting Services Agreement.

(c) This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assignees.

12.4. <u>Governing Law</u>. This Agreement shall be solely governed by and construed in accordance with the laws of the Relevant Jurisdiction, without regard to principles of conflict of laws. The Parties hereby irrevocably submit to the exclusive jurisdiction of the courts of the Relevant Jurisdiction for the purpose of any proceeding arising out of this Agreement other than as set out in Section 12.5 (Dispute Resolution).

12.5. <u>Dispute Resolution Process</u>. In the event of any dispute or disagreement between the Parties related to this Agreement or any schedule or attachment ("**Dispute**" or "**Disputed**"), upon the written request of either Party, the Parties will meet for the purpose of resolving such Dispute. The Parties agree to, in good faith, attempt to informally resolve such Dispute promptly and in an amicable manner ("**Informal Dispute Resolution**"). Both Parties shall continue performing their respective obligations under this Agreement while any Dispute is being resolved. Notwithstanding this Section 12.5, the Parties may seek available remedies in any forum in accordance with Section 12.4.

12.6. <u>Severability</u>. In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. If, however, any provision of this Agreement shall be invalid, illegal or unenforceable under any Applicable Laws in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to

17

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

the minimum requirements of such Applicable Laws, or, if for any reason it is not deemed so modified, it shall be invalid, illegal or unenforceable only to the extent of such invalidity, illegality or limitation on enforceability without affecting the remaining provisions of this Agreement, or the validity, legality or enforceability of such provision in any other jurisdiction.

12.7.    <u>Relationship</u>. Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, fiduciary or employment relationship between the Parties nor shall any Party have the right, power, or authority to create any obligation or duty, express or implied, on behalf of any other Party. The Parties will remain at all times independent contractors. In no event will either Party's employees, agents or subcontractors be considered agents or employees of the other Party and neither Party shall be liable for any employee, contractor, agent or subcontractor obligations of the other Party. Purchaser shall be fully responsible for all acts and/or omissions of personnel it may employ or contact with in connection with this Agreement.

12.8.    <u>Counterparts</u> This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile and e-mailed copies of signatures shall be deemed to be originals for purposes of the effectiveness of this Agreement.

12.9.    <u>Further Assurance</u>. Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be reasonable and necessary to give all Parties the full benefit of this Agreement.

12.10.    <u>Condition Precedent.</u> This Agreement must be entered into by the Parties concurrently with the Parties entering into the Collaboration Sale Agreement and the Hosting Services Agreement.

*[The remainder of this page is intentionally left blank]*

18

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8

# BITMAIN

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement on the date first written above.

Signed for and on behalf of BITMAIN

**BITMAIN TECHNOLOGIES GEORGIA LIMITED**

Signature _____ *Cheng Ran*

Name:

Title:

Signed for and on behalf of Purchaser

**OLD CONST LLC.**

Signed by:

Signature _____ *Yizheng Wang*

Name: _____ Yizheng Wang

Title: _____ Manager

19

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8



## SCHEDULE A

## HOSTING SERVICES AGREEMENT

[BITMAIN to attach signed copy of the Hosting Services Agreement executed between the Parties]

50492702.5

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8



**SCHEDULE B**

**COLLABORATION SALE AGREEMENT**

[BITMAIN to attach signed copy of the Collaboration Sale Agreement executed between the Parties]

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8



## SCHEDULE C

### DISCOUNTED AMOUNT REPAYMENT TERMS

1.1.    Payment of the Discounted Amount

Unless otherwise agreed by the Parties, the Discounted Amount, as defined in the Collaboration Sale Agreement, will be satisfied by Purchaser when the Total Hosting Fee Discount equals the Discounted Amount.

The Purchaser must identify the batch of Products that any payment made by the Purchaser applies to, in the case of multiple batches of Products, otherwise BITMAIN may determine which batch of Products to apply the payment to in its sole discretion.

1.2.    Default of Full Payment of the Total Purchase Price

In the event that the Purchaser fails to pay the Total Purchase Price, as a result of a either a failure to pay (i) the Net Total Price in accordance with the Collaboration Sale Agreement; or (ii) the Discounted Amount in accordance with the Hosting Services Agreement and Section 1.1 of this Schedule, without BITMAIN's prior written consent, BITMAIN, in its sole discretion, shall be entitled to charge interest on all unpaid amounts with respect to each applicable batch of Products, at a rate of twelve percent (12%) per annum, and the Outstanding Discount and any payments owing under the Collaboration Sale Agreement shall be immediately payable in full.

Docusign Envelope ID: EC7A0795-C9D0-4143-BF92-6714485EF4A8



### SCHEDULE D

### ON-RACK SALES AND PURCHASE AGREEMENT

[BITMAIN to attach signed copy of the On-Rack Sales and Purchase Agreement executed between the Parties]

50492702.5